IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Lee S. Gillett, | : | |
| | : | Case No. 1:12-cv-667 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Defendants' Motion for |
| United Steelworkers of America, | : | Summary Judgment and Denying |
| Local 7697, *et al.* | : | Plaintiff's Motion for Summary |
| | : | Judgment |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 27) and Plaintiff's Motion for Summary Judgment (Doc. 28). Plaintiff Lee S. Gillett has sued Defendant United Steelworkers ("USW") and Defendant United Steelworkers Local 7697 ("Local 7697") for breach of the duty of fair representation pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Section 301 has a six-month limitations period. Gillett did not file this suit in a timely manner within that limitations period. Additionally, § 301 requires a plaintiff to prove both a breach of collective bargaining agreement by the employer and unfair representation by the union, even when the plaintiff has sued only the union. Gillett has not presented sufficient evidence to establish that his employer breached the collective bargaining agreement. For these independent reasons, the Court will **GRANT** Defendants' Motion for Summary Judgment and **DENY** Plaintiff's Motion for Summary Judgment

**I.    BACKGROUND**

**A.    Factual Background**

This Court's Standing Order Governing Civil Motions for Summary Judgment ("Standing Order") requires a party moving for summary judgment to file a statement of

1

proposed facts supported by specific citations to an affidavit, deposition, or other item of evidence. The Standing Order further requires the opposing party to admit or deny each proposed fact. Denials must be supported with a specific citation to an affidavit, deposition, or other item of evidence. Proposed facts not properly denied are deemed admitted.

The background facts that follow are derived from Plaintiff's Proposed Undisputed Facts (Doc. 28 at PageID 1425–36), Defendants' Response thereto (Doc. 34-1), and Defendants' Proposed Undisputed Facts (Doc. 27-1). Plaintiff Gillett failed to respond to Defendants' Proposed Undisputed Facts even after Defendants pointed out his omission. (Doc. 36 at PageID 2495.) Accordingly, pursuant to the Standing Order, Defendants' well-supported Proposed Undisputed Facts will be accepted as true for purposes of Defendants' Motion for Summary Judgment. The Court will provide citation to the record for any disputed facts and where appropriate.

### 1. Introduction to the Parties

Plaintiff Gillett is a Jewish male, age 36 at the time the pending Motions for Summary Judgment were briefed. He was employed by the Ingersoll-Rand Company ("the Company") at its Steelcraft Plant in Blue Ash, Ohio from November 2000 until he was terminated in October 2009. The Company manufactures steel doors and frames for residential and commercial structures at the Steelcraft Plant.

Defendant USW is the certified collective bargaining representative for hourly employees at the Steelcraft Plant. Defendant Local 7697 is an agent of the USW. Local 7697 and the USW, jointly, are referred to herein as the Union. USW provides Local 7697 with management, legal, and other services. The Union currently represents approximately 430 employees. From 2006 through 2009, the Union represented roughly 660 members.

Gillett was required to join the Union when he was hired by the Company in 2000. During the course of his employment with the Company, he paid approximately $7,000 in dues to Local 7697.

**2.    The CBA**

Gillett's employment was governed by the collective bargaining agreement ("CBA") between the Union and the Company. (Doc. 27-4 at PageID 476–506.) As a member of the Union, Gillett was entitled to challenge the Company's violations of the CBA through a grievance process set forth in the CBA. (*Id.* at PageID 493–95.)

The CBA had provisions addressing overtime, holidays, and suspensions and terminations, among other areas. Most of the relevant CBA provisions will be discussed in the "Analysis" section below. The CBA also contained an Absence Control Policy which is central to the parties' dispute and will be explained up front. (*Id.* at PageID 501–04.) The Absence Control Policy established a point system for absences and tardies and imposed progressive discipline. Employees were given one point for unexcused absences and one-half point for unexcused tardies. (*Id.* at PageID 501–03.) Employees who failed to give proper notice of an absence received an additional one-half point. (*Id.*) Employees with perfect attendance for a calendar month earned a deduction of one attendance point. (*Id.* at PageID 503.) Employees with perfect attendance for three consecutive calendar months earned one personal day off. (*Id.*) Employees received progressive discipline up to and including termination for the accumulation of points as follows:

> Six points:  Written verbal warning,
> Nine points:  Written reprimand,
> Twelve points:  Zero day suspension, and
> Fifteen points:  Discharge with proper documentation.

(*Id.*)

Gillett was aware of the Absence Control Policy in the CBA. He knew he received points every time he was absent from or late to work. He also knew that he had had attendance points deducted when he achieved perfect attendance during a month. He understood that employees who received fifteen attendance points were subject to termination.

### 3. Plaintiff Gillett's Termination and Grievances

On October 27, 2009, Plaintiff was absent from work bringing his attendance point total to fifteen and one-half points. The Company terminated Gillett's employment on October 29, 2009 pursuant to the Absence Control Policy. That same day, Gillett met with Don Brammer, the Union's grievance committee chairperson, to review Gillett's attendance points. Brammer stated in a written declaration that Gillett did not challenge or question any of the attendance points. (Brammer Dec., Doc. 27-4 at PageID 469.) However, Gillett testified that he told Brammer that one or two of his attendance points were the subject of pending group grievances. (Gillett Dep., Doc. 27-2 at PageID 250.)[1] In any event, Gillett and the Union filed grievance number 10288 ("the termination grievance") on October 29, 2009 to challenge the termination. (Doc. 27-4 at PageID 508.) The Company denied the grievance and the Union appealed the grievance to arbitration.

In January 2010, the grievance committee of Local 7697 concluded that Gillett had accumulated fifteen attendance points. The grievance committee submitted Gillett's termination grievance to David McLean, the USW staff representative assigned to Local 7697 whose duties included settling and arbitrating grievances. McLean withdrew Gillett's termination from arbitration.

---

[1] Gillett asserted in a brief in the *Younger* suit, *see infra*, that he did not learn that he was a participant in one of two grievances, the snow day grievance, until after the close of discovery in the *Younger* case. (Case No. 1:10-cv-849, Doc. 62-1 at PageID 2021 n.2.) He could not have told Brammer about the snow day grievance in October 2009 if he did not know of its existence at that time.

At the time he was terminated, Gillett was part of a pending group grievance filed by a group of employees after they refused to work overtime on Saturday, July 7, 2007.  The Company gave each of the employees one attendance point pursuant to the Absence Control Policy for their refusal.  The group of employees filed grievance number 9605 ("the overtime grievance") in response.  (Doc. 27-4 at PageID 654.)  The grievance was denied at the first three initial steps and the employees appealed through arbitration.  (*Id.* at PageID 654–55.)  Due to a backlog of grievances, the group overtime grievance had not been arbitrated when Gillett was terminated in October 2009.

Gillett asserts that he was also a part of a pending group grievance filed after a group of employees received attendance points on a day the county had declared a snow emergency.  (Gillett Dec., Doc. 30-1 at PageID 1489.)  Gillett asserts that he received one-half point or one point on that snow emergency day.  (*Id.*)  Gillett does not specify the date he missed work due to a snow emergency, nor does he submit any documents or records to support his assertion that he was a participant in a snow day grievance.  The Union denies that Gillett was part of a group snow day grievance because its records indicated Gillett was not given an attendance point on any day for which a weather-related grievance was filed.  (Becker Dec., Doc. 27-3 at PageID 300; Brammer Dec., Doc. 27-4 at PageID 470–71.)  Twelve snow day grievances were filed between 2007 and 2010 and appealed to arbitration.  They were never arbitrated due to the backlog of grievances.

    **4.**    **Arbitration Backlog Agreement**

Prior to February 2012, the Union had approximately 150–200 grievances pending at any one time.  (Brammer Dec., Doc. 27-4 at PageID 472.)  On February 22, 2012, the Union and the Company signed a Proposal to Address Arbitration Backlog ("Arbitration Backlog Agreement").

(Doc. 27-3 at PageID 445–49.)  The Arbitration Backlog Agreement settled a majority of the approximately 200 pending grievances on a non-precedential basis, including the group overtime grievance and the snow day grievances.  To resolve the group overtime grievance, the Company agreed to remove one attendance point for affected employees, but the Company did not adjust any attendance point disciplines.  (*Id.* at PageID 447.)  Only current employees of the Company had attendance points removed.  (Becker Dec., Doc. 27-3 at 304–05.)  The twelve snow-day grievances were resolved in a similar fashion.  (Doc. 27-3 at PageID 448.)  The Company agreed to remove one attendance point for the affected employees, but would not adjust attendance point disciplines.  (*Id.*)  There was no economic component to the resolution of the group overtime grievance or the snow day grievances.  (*Id.* at PageID 447–48.)

**B.      Procedural History**

The current case is related to the case of *Anthony T. Younger and Lee S. Gillett v. Ingersoll-Rand Co.*, No. 1:10-cv-849, filed in this District on December 1, 2010.  Younger and Gillett alleged claims against the Company in *Younger* for (1) discrimination on the basis of race, national origin, and religion; (2) retaliation; and (3) intentional infliction of emotional distress.  (No. 1:10-cv-849, Doc. 2.)  Most relevant to this suit, Gillett alleged in the *Younger* suit that the Company terminated him because he was Jewish.  (No. 1:10-cv-849, Doc. 148 at PageID 10728, 10746, 10754.)  The Court concluded at summary judgment, however, that Gillett did not have sufficient evidence to establish that he was terminated on the basis of his religion.  The Court stated that Gillett had presented "absolutely no evidence that Gillett's termination resulted from anything other than the routine and uniform application of Steelcraft's attendance policy."  (*Id.* at PageID 10754–55.)  The Court granted summary judgment to the Company on all claims except

6

the hostile work environment claims. (*Id.* at PageID 10716, 10778.) The parties settled the hostile work environment claims on December 9, 2013. (No. 1:10-cv-849, Doc. 156.)

Plaintiff Gillett filed the current suit on August 31, 2012 against USW and Local 7697. (Doc. 2.) Gillett has asserted a claim for a violation of the duty of fair representation against Defendants in violation of § 301 of the LMRA, 29 U.S.C. § 185. Defendants have denied liability. Defendants, jointly, and Plaintiff Gillett filed cross motions for summary judgment after the close of discovery. The cross motions are ripe for resolution.

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of showing that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811. "Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson,* 371 B.R. 798, 800–01 (B.A.P. 6th Cir. 2007).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to

a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

Section 301 of the LMRA authorizes employees to bring hybrid suits against their employers for breach of the collective bargaining agreement and against labor organizations for breach of the duty to provide fair representation to the employees. 29 U.S.C. § 185. The duty of fair representation is implied under the scheme of the National Labor Relations Act. *See DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 164 & n.14 (1983). A claim against an employer under § 301 is "inextricably interdependent" with the fair representation claim against the union. *Id.* "[W]hen the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation . . . , an employee may bring [a § 301] suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* The employee must prove both (1) that the company breached the collective bargaining agreement and (2) that the union breached its duty of fair representation in order to prevail against either the company or the union. *Id.* at PageID 164–65; *Garrish v. Int'l Union United Auto., Aerospace and Agric. Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir.

2005). The case the employee must prove is the same whether the employee sues the company, the union, or both. *DelCostello*, 462 U.S. at 164–65. Accordingly, in order to establish liability against the Union, Gillett must prove both that the Company breached the CBA when it terminated his employment pursuant to the Absence Control Policy and that the Union breached its duty of fair representation when it withdrew Gillett's termination grievance.

A.  **Gillett's § 301 Claim Is Time-Barred**

Before examining the merits of Gillett's § 301 claim, the Court will address the Union's contention that Gillett's claim is time-barred. There is no express limitations period for hybrid § 301 claims. *See* 29 U.S.C. § 185; *DelCostello*, 462 U.S. at 158. In *DelCostello*, the Supreme Court, finding no appropriate analogous state law statute of limitations, borrowed the six-month statute of limitations from § 10(b) of the National Labor Relations Act[2] to define the appropriate limitation period for § 301 claims. 462 U.S. at 169–70. The six-month limitations period starts to run "when the claimant knows or should have known of the union's alleged breach of its duty of fair representation." *Bickers v. Int'l Ass'n of Machinists and Aerospace Workers*, 8 F. App'x 514, 516 (6th Cir. 2001) (citation omitted). The accrual date is determined objectively, and "the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue." *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000 (6th Cir. 1994)

---

[2] Section 10(b) of the National Labor Relations Act provides in relevant part as follows:

> Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect . . . [.] [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . .

29 U.S.C. § 160(b).

(citation omitted). Therefore, the statute of limitations expired six months after the date Gillett discovered, or should have discovered, that USW and Local 7697 allegedly had breached their duty of fair representation by withdrawing his termination grievance.

Gillett filed the Complaint in this case on August 31, 2012. (Doc. 2.) Gillett alleged in the Complaint that he first learned that the Union withdrew his termination grievance in July 2012. (*Id.* at PageID 9.) However, on October 26, 2011, Gillette testified in a deposition for the *Younger* suit that he understood then that the Union had withdrawn his termination grievance:

> Q: […] Right now I'm asking you, from our records the union withdrew the grievance, meaning they filed it and then decided we're not going to arbitrate. They withdrew it.
>
> Do you have any reason to dispute the fact that the union elected not to go to arbitration? I'm not saying the reasons. Just the fact that they elected not to take it to arbitration.
>
> A: Do I have any -- can you repeat the question?
>
> Q: That's consistent with your understanding of what happened; right? The union did not pursue your grievance?
>
> A: Yes, as far as I know.

(No. 1:10-cv-849, Doc. 71-6 at PageID 3725.) Gillett does not respond to the Union's statute of limitations argument. He does not refute the analysis that the limitations period began to run no later than October 26, 2011, the date he acknowledged that the termination grievance had been withdrawn by the Union. Although the overtime and snow day grievances were not yet resolved, "an employee may bring suit against both the employer and the union**,** *notwithstanding the outcome or finality of the grievance or arbitration proceeding*." *DelCostello*, 462 U.S. at 164 (emphasis added).

Accordingly, the limitations period for Gillett's unfair representation claim began on October 26, 2011. Gillett filed this suit on August 31, 2012, more than six months later.

Gillett's claim that the Union breached its duty of fair representation by not pursuing his termination grievance is barred by the statute of limitations. The Court will grant summary judgment to the USW and Local 7697 on the grounds that Gillett's § 301 claim is time-barred.

**B.      Gillett Cannot Establish a § 301 Claim Against the Company**

Alternatively, even if the § 301 claim was not time-barred, the Union is entitled to summary judgment on the separate basis that Gillett cannot establish on the evidence presented that the Company breached the CBA when it fired Gillett. Gillett makes only one argument to support a finding that the Company breached the CBA. He argues that the fact that the Union filed a termination grievance on his behalf indicates that the Union believed that the Company breached the CBA. The filing of a grievance, however, is not sufficient to establish a CBA breach in a § 301 action.

Instead, the Court begins by examining the plain language of the CBA. *See Williams v. United Steelworkers of Am.*, 487 F. App'x 272, 275 (6th Cir. 2012) ("To determine whether [a company] violated the CBA, we start with the plain language of the agreement."). Under the Absence Control Policy, the Company had the right to terminate employees who accumulated fifteen attendance points. (Doc. 27-4 at PageID 503.) Gillett does not dispute that he had accumulated fifteen and one-half points as of October 27, 2009. He argues that that the Company should not have terminated him because he was a participant in two grievances still pending arbitration, the group overtime grievance and a snow day grievance. Gillett suggests that if the group grievances had been successful, then attendance points would have been deducted and he would not have been subject to termination under the Absence Control Policy.[3]

---

[3] Gillett made a similar argument to support his religious discrimination claim in Case No. 1:10-cv-849. The Court found that Gillett lacked evidence to prove that the attendance points had been issued in a discriminatory manner. (No. 1:10-cv-849, Doc. 148 at PageID 10754.)

11

Gillett's argument is not supported by the facts and fails for four reasons.  First, there is no objective evidence to support Gillett's assertion that he was a participant in a group snow day grievance.  Second, there is no reasonable basis to conclude that the overtime grievance would have been successful.  Third, the existence of a pending grievance does not preclude termination pursuant to the Absence Control Policy.  Fourth, the settlement of the overtime grievance as part of the Arbitration Backlog Agreement did not result in the reversal of any attendance point disciplines.

As to the first point, Gillett offers no objective evidence that he was the participant in a snow day grievance.  He does not identify the date that he missed work due to a county snow emergency.   He presents no Company or Union records indicating that he signed a snow day grievance.  In contrast, the Company's human resources coordinator and the Union's grievance committee chairperson compared the date of each weather-related grievance filed between 2006 and 2009 to the dates on which Gillett missed work. (Becker Dec., Doc. 27-3 at PageID 298–301; Brammer Dec., Doc. 27-4 at PageID 470–71.)  They determined on the basis of this evidence that Gillett was not given an attendance point on any day for which a snow day grievance had been filed. (*Ids.*)  Neither the Company nor the Union provided a copy of the snow day grievances to the Court, but their witnesses identified each grievance by grievance number and date. (*Ids.*)  The grievance numbers and dates match up to the grievance numbers and dates settled pursuant to the Arbitration Backlog Agreement. (Doc. 27-3 at PageID 448.)  Additionally, Gillett does not dispute that the grievances identified by the Union and the Company were the snow day grievances settled pursuant to the Arbitration Backlog Agreement.  A reasonable jury could conclude on the basis of this evidence only that Gillett was not a participant in a snow day grievance.  Gillett's non-specific and unsupported assertions to the

contrary are not sufficient to create a dispute of material fact.  *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment.")

Second, Gillett has not established that the group overtime grievance would have been successful.  The CBA addressed "Hours of Work and Overtime" in Article 5.  (Doc. 27-4 at PageID 481.)  Article 5 § 2 defined the normal hours of work to be eight hours per day and forty hours per week.  (*Id.*)  The scheduled workweek included only Monday through Friday.  (*Id.*)  Article 5 § 5 provided that employees were "expected to work overtime," except that overtime could not be required for employees who had worked at least sixteen overtime hours in a scheduled workweek.  Section 5 stated as follows:

> Overtime shall be on a voluntary basis if . . . the employee has worked in excess of sixteen (16) overtime hours in a scheduled workweek.  If an employee is scheduled to work overtime and the scheduled overtime will exceed sixteen (16) hours in the workweek, the affected employee has the right to decline the overtime by advising his or her Team Leader of their intent not to work. . . . Employees that do not make notification of their intent not to work under the above guidelines shall be deemed to have accepted the scheduled overtime.

(*Id.*)  Article 5 § 7 provided that employees required to work overtime on a Saturday would receive time and one-half pay.  (*Id.* at PageID 482.)

The employees who filed the group overtime grievance each had received an attendance point under the Absence Control Policy when they refused to work overtime on Saturday, July 7, 2007.  The employees believed the shift would put them over the sixteen-hour overtime threshold at which they could decline to work the overtime hours.  The employees' calculation of their overtime hours included the hours they had worked on Wednesday, July 4, 2007, a holiday.

The Company took the position that the hours the employees had worked on the July 4th holiday did not count towards the computation of weekly overtime hours for purposes of Article

13

5 § 5. (Becker Dec., Doc. 27-3 at PageID 303.) The CBA addressed "Holidays" in Article 6, separate from the treatment of overtime in Article 5. (*Id.* at PageID 485–86.) Article 6 did not use the term "overtime." Article 6 provided that employees required to work on a holiday received a defined premium wage, but it did not authorize treating the holiday hours as overtime hours. (*Id.*)

The Company's records indicated that Gillett had worked forty-eight hours, which included only eight overtime hours, between Monday, July 2, 2007 and Friday, July 6, 2007. (*Id.*) Working eight additional overtime hours on Saturday, July 7, 2007 would not have pushed Gillett over the sixteen-hour overtime limit pursuant to the Company's calculation. Gillett has not offered any argument to rebut the Company's interpretation and application of the CBA to the July 7, 2007 overtime issue. As such, he has not established that the group overtime grievance would have been successful or that he should not have received an attendance point for that day.

As to the third point, the CBA did not prohibit the Company from terminating Gillett simply because the group overtime grievance was pending arbitration. Gillett did not dispute that he had accumulated fifteen points, the benchmark for termination pursuant to the Absence Control Policy. (Gillett Dep., Case No. 1:10-cv-849, Doc. 101 at PageID 4714, 4730–31.) Mike Becker, the human resources coordinator for the Company, stated in his Declaration that the filing of a grievance over an attendance point did not automatically remove the point from the employee's attendance record. (Becker Dec., Doc. 27-3 at PageID 300.) Gillett does not identify any CBA provision to the contrary. The Court has reviewed the CBA, including Article 12 "Adjustment of Grievances," Article 13 "Discharge and Suspension," and the Absence Control Policy. (Doc. 27-4.) The Court found no provision indicating that an attendance point

was removed upon the filing of a grievance or that the existence of a pending grievance precluded the Company from terminating an employee who had accumulated fifteen attendance points.

Finally, there is no factual basis to conclude that Gillett's termination would have been overturned as part of the Arbitration Backlog Agreement. Participants in the group overtime grievance received a deduction of one attendance point, but the Company specifically refused to adjust any attendance disciplines. (Doc. 27-3 at PageID 447.) Therefore, Gillett would have remained subject to termination under the Absence Control Policy even if that discipline had been stayed until the resolution of the overtime grievance.

In sum, the material facts are not in dispute. Plaintiff Gillett cannot establish on the evidence presented that the Company violated the CBA when it terminated him pursuant to the Absence Control Policy. Gillett's § 301 claim against the Union fails as a matter of law whether or not the Union breached its duty of fair representation with regards the handling of Gillett's termination grievance. *See DelCostello*, 462 U.S. at 164–65 (stating that a plaintiff must prove both breach of a CBA and unfair representation to establish a § 301 claim); *Garrish*, 417 F.3d at 594 (same). Summary judgment will be granted to the Union and denied to Gillett on this basis.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. 27) is **GRANTED** and Plaintiff's Motion for Summary Judgment (Doc. 28) is **DENIED**.

IT IS SO ORDERED.

S/Susan J. Dlott_____<br>
Chief Judge Susan J. Dlott<br>
United States District Court